(No. 21257.—

THE PEOPLE *ex rel.* Joseph B. McDonough, County Collector, *et al.* Appellants, *vs.* LILLIAN CESAR, Appellee.

*Opinion filed July 26, 1932—Rehearing denied October 7, 1932.*

JOHN A. SWANSON, State's Attorney, JAMES F. CLANCY, and WALTER E. JOHNSON, (JOHN E. PEDDERSON, LOUIS H. GEIMAN, THOMAS D. NASH, URBAN A. LAVERY, and HAYDEN N. BELL, of counsel,) for appellant the county collector.

WILLIAM H. SEXTON, Corporation Counsel, and FRANCIS X. BUSCH, (CASSIUS M. DOTY, and BERNARD K. SHAPIRO, of counsel,) for appellant the city of Chicago.

ROY D. KEEHN, and MORRIS SCHAEFFER, for appellee.

Mr. CHIEF JUSTICE HEARD delivered the opinion of the court:

On September 8, 1930, the county collector of Cook county filed in the county court of that county an application for judgment and order of sale against all the lands and lots upon which the taxes and special assessments remained for the year 1928 due and unpaid as described in a delinquent list filed, as provided by law. The court entered an order that all persons interested in the lands and lots described in the application and desiring to make objections to judgment and order of sale should file their objections on or before 12:00 o'clock noon, September 13, 1930. On September 12, 1930, an objection was filed in behalf of various parties, and while the abstract does not show that Lillian Cesar was one of such parties the objection was treated by the county court as if she were, and it is so treated in the briefs of both appellants and appellees in this court. On September 13, 1930, the court entered an order against the lands and lots described in the delinquent list as prayed in the application, "excepting from the judgment and order of sale all taxes and special assessments, interest, penalties and costs against lands and lots as to which this court has not entered judgment and order of sale for any reason as shown in the rules of this court and

as indicated by appropriate entries in the tax, judgment, sale, redemption and forfeiture record herein."

On July 13, 1931, the county collector of Cook county made an application to the county court of that county for judgment and order of sale against all the lands and lots upon which the taxes remained due and unpaid for the year 1929 as described in the delinquent list filed in such court, as provided by law. The court ordered that all persons desiring to file their objections should file the same on or before July 20, at 12:00 o'clock noon. On July 21, 1931, a number of objections were filed by certain attorneys representing property owners, and although Mrs. Cesar is not shown by the abstract to have been one of these parties the cause has been treated throughout as if she were. On July 24, 1931, the county court rendered judgment on the application against all of the lands and lots described in the application, with a like exception. On December 24, 1931, an order was entered by the court, on motion of the city of Chicago, allowing the city of Chicago to intervene in the proceedings and to file a written brief and argument therein. A hearing was had upon the objections of Lillian Cesar for the years 1928 and 1929. Just when and how these objections were consolidated for hearing does not appear from the record. After such hearing a judgment was entered by the court sustaining her objections and refusing judgment upon the application of the county collector for judgment and order of sale against her property for the general taxes for the year 1928 and for the year 1929, and incorporated in such judgment a finding of facts that the entire tax levied for 1928 and 1929 was invalid. The cause is brought here on appeal by the county collector and the city of Chicago.

When the cause came on for hearing, counsel for objector amended the objections already filed for both the 1928 and 1929 taxes by the addition of the following: "That the said board of assessors, for the years 1920 to

and including 1929, have willfully, knowingly and intentionally failed, refused and neglected to value and assess vast amounts of personal property in Cook county, Illinois, subject to taxation and not exempt under the laws of Illinois; that the said board of review has during the same period of time willfully, knowingly and intentionally failed, refused and neglected to assess all such personal property subject to assessment which is not assessed by said board of assessors; that for upwards of ten years last past, including the years 1928 and 1929, said board of assessors have deliberately, systematically and willfully omitted to value and assess for taxation vast amounts of personal property in Cook county subject to taxation and not exempt under the laws of Illinois; that during the same period of time the said board of review deliberately, systematically and willfully failed to correct the assessment as made by the board of assessors, and also failed to assess vast amounts of personal property subject to taxation and not exempt under the laws of Illinois and which was not assessed by the board of assessors." Counsel likewise stated: "It is my purpose in this objection to raise the question of the illegality of the entire assessment in so far as the assessment constitutes a violation of both the statutes and the constitutions, State and Federal. * * * At the outset I would like to have a distinct understanding that so far as the issues involved in this case are concerned they are going to be limited to two questions: One, a denial of due process under the State and Federal constitutions; and second, denial of equal protection under the State and Federal constitutions on the question of discrimination as between classes."

The quadrennial assessment of real estate was made in 1927. In 1928 the 1927 assessment of real estate in Cook county was found to be lacking in uniformity among the various sub-districts of the county, and a re-assessment of real estate for 1928 and the remainder of the quadrennial was ordered by the State Tax Commission.

Appellee's first contention as to the violation of the due process of law provisions of the constitutions is, that by the 1928 assessment the valuation of her property and its assessed value were increased without personal notice to her. The proceeding for the collection of taxes against real estate is a proceeding *in rem,* as to which the constitution does not require personal notice. It is stipulated in the record that the statutory notice by publication was given. That objector had personal notice is evidenced by the fact that she filed complaints as to the 1928 assessment both before the board of assessors and the board of review, and that the board of assessors, acting upon her complaint and by certificate of error, reduced the assessed valuation of her property $2207. In consequence such contention cannot be maintained.

In a complaint filed before the board of assessors objector alleged as her only ground of complaint, "owner contends land valuation excessive," and in her complaints to the board of review she asked the board to review and reconsider the valuations placed on her property by the board of assessors, "for the reason that said valuation figures set by the board of assessors upon said property are excessive." The re-assessment of 1928 was made in an entirely different manner from any assessment theretofore made in the city of Chicago. It was conducted under the supervision of a high-salaried valuation engineer and with the advice of financial experts from the universities and real estate organizations of the city of Chicago. Its making, instead of occupying the usual time allotted by law for the assessment of both real and personal property, occupied about eighteen months, and in its making about one thousand persons from various cities were engaged, at an initial expense of about $800,000, for which a special appropriation was made by the board of county commissioners. It was made in accordance with plans and specifications evolved by the scientific tax experts. Each piece of real estate in Cook county

was measured, mapped, a description thereof placed upon a card, card indexed, its area checked, the buildings appraised, the building values extended and the extensions checked, and a permanent record thereof made and filed in a steel cabinet kept for that purpose in the office of the board of assessors of Cook county, as will more fully appear by the following record of objector's property:

Oak Park, section 8, 39, 13 block 103.

439 No. Taylor ave., Oak Park.

Measured by "1825," W. Crook. Areas checked by W. Rochshild. Building appraised by B. Broske 4/2/29. Building values extended by Frances Janet. Extensions checked by Rose Jorgensen 8/9/29.

Land formula by Hallinan 7/24/29.

Corners by Hallinan 7/24/29.

Units entered by Hallinan 7/24/29.

Land computations by A. M. Braun 8/3.

Extensions checked by M. Peterson 8/9.

Lot located at S. W. corner Chicago ave. & Taylor st., Oak Park.

Lot 8, block 3, etc.

37½ ft. frontage on Taylor st., 170.81 ft. frontage on Chicage ave.

Assessed $200 per unit ft. on Chicago ave.

Assessed $270 per unit ft. on Taylor st.

Assessed on said basis $23,228, (land only,) later corrected to—

Assessed $150 per unit ft. on Chicago ave.

Assessed $200 per unit ft. on Taylor st.

Assessed on said basis $17,264 (land only).

NOTE—A unit foot is one foot wide and 125 feet deep.

Description: Bungalow, plain exterior trim of wood, hardwood flooring, wood frame construction, floors on wood joists, full basement with cement floor, pine interior finish, plastered and decorated interior, concrete foundation, gable roof, hot air furnace heat, electric lights, exterior walls of stucco, composition roofing, two toilets and one bath-room with tile floors, front porch and rear porch, five rooms plus two finished attic rooms, age seven years.

1084 square feet.

Unit price 4.25 sq. ft.

New cost 4607—condition 85%............$3,915.00

Two-car garage.

New cost $300.00, condition 75%...........  225.00

Total full values of bldgs...............$4140.00

In this manner each piece of real estate in Cook county, approximately 1,300,000 pieces, was appraised and recorded. In making the appraisal the general method of handling the re-assessment was, first, on the land valuations, to divide the city of Chicago into forty-four districts of comparable size and convenient geographical area. The Chicago Real Estate Board and the Cook County Real Estate Board were requested to submit to the board of assessors in each of these forty-four districts a list of five or six real estate men who, it was felt, would be competent to place fair real estate values within the district. That was done and these lists were submitted to the board of assessors, and they selected one man from each list, or two men from some of the lists, and these men were asked to become a committee of deputies to place the fair land values in each of these districts. As an aid to these men the staff prepared land value maps to enable them to place the prices on the different streets. These men submitted their results to the staff. The staff gathered such data as they could, and the map, with the results, was submitted to a co-ordinating committee. These men were outstanding real estate men, with broad experience throughout the city, and they passed upon the relative correctness of each of these maps. The final maps were submitted to the board of assessors, who looked them over and examined them for certain periods of time and finally approved them. They indicated their approval of them by attaching the signatures of the board of assessors to each map. The maps were then turned over to the staff and the land values were computed for each individual lot, using the mathematical formula which had been developed to prove the systematic result as to each piece of property. The buildings had been appraised in the field on these property record cards, and the two added together and extended produced the full value and appraisal of all real property in Cook county. At the time of making this assessment paragraph 297 of the Revenue act pro-

vided: "Real property shall be valued at its fair cash value, estimated at the price it would bring at a fair voluntary sale in the course of trade, which shall be set down in one column to be headed 'full value,' and said full value shall be set down in another column which shall be headed 'assessed value.'" In making this scientific re-assessment of real property this provision of the statute was disregarded, and while the "full value" was put down in one column the same value was not set down in the column headed "assessed value," but thirty-seven per cent thereof was computed and placed in the column headed "assessed value." This statutory requirement applied to the assessment of property in all of the counties of the State. The uniformity of taxation which is required by the constitution is not a uniformity solely as between the several pieces of property in one taxing district but is a uniformity throughout the several counties of the State. There is no evidence in the record showing or tending to show that the valuation placed upon objector's real estate in the re-assessment of 1928 was too high as compared with other like properties in this State.

For the year 1928 there were filed with the board of review, within the time prescribed by law, 67,754 individual complaints alleging over-assessment of the property described therein. Of these complaints the board of review heard 18,431 and did not grant a hearing to 49,323 of such complaints, including that of the objector in this case. For the year 1929 there were filed with the board of review 40,941 complaints against excessive valuations of real estate, of which the board of review heard 2409 and did not grant a hearing to 38,532 of such complaints, including that of the present objector. By paragraph 314 of the Revenue act it is provided: "On complaint in writing that any property described in such complaint is incorrectly assessed, the board shall review the assessment, and correct the same, as shall appear to be just. Such complaint to

affect the assessment for the current year shall be filed on or before the first day of August: Provided, that if the assessment books containing the assessment complained of are not filed with the board of review by the 20th day of July, then such complaint shall be filed on or before ten days thereafter. The board may also, of its own motion, at any time before its revision of the assessments is completed in every year, increase, reduce or otherwise adjust the assessment of any individual or corporation, on real property or personalty making changes in the valuations thereof as may be just, and shall have full power over the assessment of any individual or corporation, and may do anything in regard thereto that it may deem necessary to make a just assessment; but no assessment shall be increased until the person or corporation to be affected shall have been notified, and given an opportunity to be heard, except as hereinafter provided." By the same paragraph it is likewise provided: "For the purpose of hearing and determining complaints of errors in the valuation of real property for the next succeeding assessment thereof and correcting the valuations of any such property as shall be just, after its annual return has been made, as herein provided, the board of review shall, on the first Tuesday of November and the first Tuesday of each month thereafter until and including the first Tuesday of March in each year (except the year last preceding the quadrennial assessment) and at such other times as it may be necessary, hold public sessions at its board rooms, and continue such sessions from day to day until all complaints and other business have been disposed of. Complaints passed or undisposed of at any session shall be first considered at the next succeeding monthly session and past complaints shall be disposed of at each session before later complaints shall be considered."

The first of objector's complaints to the board of review was as to the assessment for the current year 1928, and the second was for the current year 1929. While no hearing

was had by the board of review on Mrs. Cesar's objections, yet the evidence shows that the board of review did have before it her complaints, together with all the information from the files of the assessor's office with reference to her property, and that it examined the same and rejected her claim without increasing or lowering her assessment. By the Revenue act boards of review are given power and authority to make binding rules as to the form of complaints with reference to assessments and as to the information concerning the assessed property. The board of review enacted such rules, prescribed forms of complaint and required detailed specific information to be given in the complaint. Objector's complaints in this case disregarded the rules in every respect and gave no information as to the property to the board but simply contained the conclusion that the property was over-assessed. Such a complaint, in violation of the board's rules, was entitled to no consideration.

Objector made no attempt in a court of law, by *mandamus*, to compel the board of review to give her a hearing upon her complaint, and under the repeated decisions of this court she thereby waived her right to raise the question of over-assessment of her property in the county court upon application of the county collector for judgment for delinquent taxes. Upon the neglect or refusal of the board of review to review an alleged fraudulent assessment of taxable property the owner's remedy is *mandamus* to compel the board to act, and the fact that the property owner believes that he will be unable to procure a writ of *mandamus* to compel the board to review his alleged fraudulent assessment before he will be compelled to pay the tax is not an excuse for failing to apply for the writ and seeking to enjoin the tax in the first instance. (*New Haven Clock Co. v. Kochersperger*, 175 Ill. 383; *Bistor v. McDonough*, 348 id. 624.) That the remedy in all cases for the redress of grievances of every nature is entirely within the control of

the legislature cannot now be questioned. (*Smith* v. *Bryan,* 34 Ill. 364.) While the legislature cannot deny a remedy altogether for a citizen's grievance against an official or so embarrass a remedy with restrictions as to seriously impair the value thereof, it may enlarge, limit or alter modes of procedure with reference thereto. (*Richardson* v. *United States Mortgage and Trust Co.* 194 Ill. 259.) No citizen has a vested right in any method of remedial procedure, but such method may be changed from time to time so long as no vested right as to liability is disturbed, and the remedy given by law must in all cases be pursued. (*Newland* v. *Marsh,* 19 Ill. 376; *Williams* v. *Waldo,* 3 Scam. 264.) The law having provided a tax-payer with a complete remedy for an over-valuation of his property, the county court, not being invested with the power of assessing property, is without power to consider the question of over-valuation or under-valuation of property on an application for a judgment for delinquent taxes. Objector having been furnished with a complete remedy at law of which she did not avail herself cannot successfully maintain in this proceeding that her property was attempted to be taken without due process of law, in violation of her constitutional rights.

The only question involved in this case is the right of the appellant the county collector to have judgment against objector's real property for the delinquent taxes thereon. The court had no jurisdiction for its finding that the entire taxes against all the real estate in Cook county for the years 1928 and 1929 were invalid, and such finding was based very largely upon a mass of incompetent evidence admitted over the objections of appellants. The court admitted in evidence lengthy dissertations upon the question of tax reform and the inadequacy of our taxing system to adequately assess personal property in this and other States and opinions as to vast amounts of unassessed personal property which were not based upon any knowledge

of either the persons giving such evidence or the persons whose opinions were quoted in evidence. Census reports were admitted in evidence showing the manufacture of large quantities of goods in Cook county during a series of years, without any evidence as to whether any of such goods were within the limits of Cook county on April 1, 1928 or 1929. Such reports were naturally misleading, as it is a matter of common knowledge that the manufacturers of Cook county ship their products to all parts of the United States, and to foreign countries, as speedily as possible after their manufacture. The evidence does not show what portion of such manufactured goods was assessed in Cook county in the years in question. Evidence was heard as to the value of the rolling stock of railroads, running into the hundreds of millions of dollars in Cook county, notwithstanding the fact that paragraph 49 of the Revenue act provides that rolling stock shall be listed and taxed in the several counties, towns, villages, districts and cities in the proportion that the length of the main track used or operated in such county, town, village, district or city bears to the whole length of the road used or operated, and that paragraph 339 (sub-section 5) of the same act provides that such rolling stock shall be assessed by the tax commission. It is said that the board of assessors failed to assess capital stock of the value of many million dollars. Among the duties of the tax commission sub-section 6 of paragraph 339 of the Revenue act provides: · "Assess, and value, in the manner provided by law, the capital stock, including the franchise, of all companies or associations now or hereafter incorporated under the laws of this State, except companies and associations organized for purely manufacturing and mercantile purposes, or for either of such purposes, or for the mining and sale of coal or for printing or for the publishing of newspapers or for the improving and breeding of stock, or for the purpose of banking, including any of such property as may have been omitted from assessment

in any year or years, or which, from defective description has not paid any taxes for any year or years."

Letters were received in evidence from the executive director of the Association of Real Estate Tax-payers to the board of assessors and board of review, written after the assessment rolls of personal property for the years 1928 and 1929 had been completed. These letters contained many misleading statements of fact, estimates of book and magazine writers not shown to have any knowledge on the subject, and estimates were shown that $3,990,000,000 of real estate bonds had been issued in Cook county without any evidence as to the residence of the owners thereof, their value or the amount assessed in Cook county. A business manager of the Chicago University and a member of a committee appointed in 1926 by the then chairman of the board of county commissioners under a resolution for the purpose of ascertaining the amount of appropriations it might have to make for assessment and review services of the boards of assessors and review, testified *in extenso* giving his own opinion and quoting from the committee's reports as to the cumbersome and antiquated methods of procedure in the taxing of personal property in this and other States, and, among other things, read from a letter to the board of county commissioners in which it was said "that the board of assessors, as an administrative unit and irrespective of its present personnel, is practically incapable of exercising either willingness or ability to improve its own performance." His general attitude may be summed up in these words from his testimony: "In my opinion, from my study of the matter, I do not believe there is sufficient militant honesty in Cook county to organize and operate the present system without the development of those un-uniformities to which I have referred." Of course, this testimony could throw no light on the question as to whether or not Mrs. Cesar's property had been assessed too high.

Complaint is made that the property of banks was not assessed at its value as shown by the market value on the stock exchange. The evidence shows that instead of accepting the uncertain, fluctuating and unreliable valuation of the stock market, the members of the board of review, in making the revision of the assessment, checked the sworn returns of the banks with the books of the banks and took the book value of the property for its assessed value. Subsequent events seem to have justified this action.

Complaint is made that for about twenty years an arrangement had been in effect between the assessors and the trust companies that their assessment should be made at ten per cent on the trust funds in their hands. While such an arrangement is a violation of the law, yet it is a matter of common knowledge that trust companies make large investments in government bonds and other non-taxable securities. The officers of the trust companies, or other persons having knowledge of the facts, were not called to show that any of these assessments were too low, and it is not shown that objector has sustained any injury in the matter of the assessment of the trust companies.

Many other instances of the admission of improper evidence might be cited without serving any useful purpose and which would only unduly lengthen this opinion. The evidence does show that there was undoubtedly a considerable amount of personal property which was not assessed in 1928 or 1929. It was the uniform practice in the assessor's office that no personal property of the value of $200 or less was to be placed on the roll. The evidence given by the members of the board of assessors showed that there was much personal property not assessed which could have been found and assessed if the same appropriation had been made for that purpose as was made to assess realty and the same amount of diligence shown. Members of the board of assessors attribute this shortage to the failure of the

board of county commissioners to make requested appropriations for doing the work, the small number of deputy assessors allowed, the difficulty of procuring schedules from the citizens and the shortness of time allowed for making the assessment.

Objector cannot claim lack of uniformity as to her personal property assessment as she does not seem to have made any return of personal property or to have been assessed therefor at all. In her complaints to the board of assessors and board of review she did not complain of any lack of uniformity between real and personal property or any invalidity of the assessment by reason thereof. By paragraph 261 of the Revenue act it is provided: "If any real or personal property shall be omitted in the assessment of any year or number of years, or the tax thereon, for which such property was liable, from any cause has not been paid, or if any such property, by reason of defective description or assessment thereof, shall fail to pay taxes for any year or years, in either case the same, when discovered, shall be listed and assessed by the assessor and placed on the assessment and tax books. The arrearages of tax which might have been assessed, with ten per cent interest thereon, from the time the same ought to have been paid, shall be charged against such property by the county clerk. It shall be the duty of county clerks to add uncollected personal property tax to the tax of any subsequent year, whenever they may find the person owing such uncollected tax assessed for any subsequent year." By paragraph 314 of the Revenue act it is provided: "The board of review shall, in any year, whether the year of the quadrennial assessment or not: First: Assess all property subject to assessment which shall not have been assessed by the assessor, and list and assess all property real or personal that may have been omitted in the assessment of any year or number of years, or if the tax thereon, for which such property was liable, from any cause has not been paid, or if any such property,

by reason of defective description or assessment thereof shall fail to pay taxes for any year or years, in either case the same, when discovered, shall be listed and assessed by the board in its revision of assessments, and the board may make such alterations in the description of real or personal property as it shall deem necessary." By paragraph 323 of the Revenue act it is provided: "Any assessor, or deputy assessor, or member of the board of review of assessments, or board of equalization, or other person whose duty it is to assess property for taxation or equalize any such assessment, who shall refuse or willfully neglect any duty required of him by law, or who shall consent to or connive at any evasion of the provisions of this act whereby any property required to be assessed shall be unlawfully exempt in whole or in part, or the valuation thereof be set down at more or less than is required by law, shall, upon conviction, be fined for each offense not less than one hundred dollars ($100) nor more than five thousand dollars ($5000) or imprisoned in the county jail not exceeding one year, or both imprisoned and fined at the discretion of the court; he shall also be liable upon his bond to the party injured for all damage sustained by such party as above provided, and shall also be removed from office by the judge of the court before whom he is tried and convicted." Objector made no attempt to compel by *mandamus* the assessment of omitted personal property by either the board of assessors or the board of review nor did she bring suit on any bond, and not having availed herself of any remedy prescribed by law for the redress of her grievances she must be held to have waived the same and cannot be heard to urge the same in this cause.

While the law has provided penalties for the refusal or willful neglect of any assessor or member of the board of review to perform his duty in the matter of making the assessment of taxable property, the invalidity of the whole assessment has never been held to be one of the results of

such refusal or neglect. If the whole real estate assessment of Cook county were to be held invalid in this case for lack of uniformity, it would necessarily follow as an inevitable conclusion that the entire personal property tax as well would be invalid, and that the entire State tax for the years 1928 and 1929 in all the other counties of the State would be invalid as well. Such a result would not only be a grave injustice to the many thousands of persons against whose property the same county court of Cook county rendered judgment of sale for delinquent taxes based on the same assessments of 1928 and 1929, as well as to the hundreds of thousands of persons who voluntarily paid their taxes. Such a holding would render it possible for an unscrupulous assessor to prevent government, both local and State, from functioning.

The case of *Aldrich* v. *Harding*, 340 Ill. 354, is urged as an authority for the court's holding in this case. In that case the bill filed to enjoin the collection of the tax showed that the complainant's property was assessed at 145 per cent of its actual value and more than three and one-half times the assessed value in the State generally, and that the differences in valuation were not the result of differences of opinion but were an arbitrary and fraudulent discrimination on the part of the taxing authorities, and it was held that the bill showing lack of uniformity in the assessment of property of the same class arbitrarily and fraudulently made by the board of assessors was sufficient, on demurrer, to require an answer. It has no application as an authority in this case.

In *Bistor* v. *McDonough, supra,* upon the vital question here involved it was said: "The contention that the assessments upon the lots and parcels of real estate of the appellants are void because there was discrimination in favor of personal property is not tenable. It has been the uniform rule in this State that neither the omission to assess nor the under-valuation of one kind or class of property will invali-

date the assessments upon other property in the same juris-
diction. (*Chicago, Burlington and Quincy Railroad Co.* v.
*Frary,* 22 Ill. 34; *Schofield* v. *Watkins,* id. 66; *Merritt* v.
*Farris,* id. 303; *Munson* v. *Minor,* id. 595; *Metz* v. *Ander-
son,* 23 id. 410; *Dunham* v. *City of Chicago,* 55 id. 357;
*DuPage County* v. *Jenks,* 65 id. 275; *Spencer & Gardner*
v. *People,* 68 id. 510; *People* v. *Lots in Ashley,* 122 id. 297;
*First Nat. Bank of Urbana* v. *Holmes,* 246 id. 362.) * * *
The serious consequences of the doctrine that the omission
to assess, or the under-valuation of, taxable property de-
stroys the validity of the assessment upon other property
in the same district were stated in *Dunham* v. *City of Chi-
cago,* 55 Ill. 357, at page 361: 'But the position that it lies
with ministerial officers to defeat the collection of taxes by
such omissions, whether made willfully or from careless-
ness, is not tenable.   Such officers may make themselves
amenable to the law for misconduct in office but cannot
thus stop the wheels of government.' " The evidence in this
case does not show the amount of the appropriations made
by the several taxing bodies in Cook county for the years
1928 and 1929 or that they were operating upon balanced
budgets, and there is no showing made that had the per-
sonal property, claimed to have been omitted, been assessed,
the taxes on appellee's real estate for those years would
have been decreased.

The judgment of the county court of Cook county is
reversed and the cause remanded to that court, with instruc-
tions to enter judgment in favor of the county collector
against appellee's property for delinquent taxes, interest and
costs for the years 1928 and 1929, in accordance with the
county collector's application for judgment.

*Reversed and remanded, with directions.*